**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| LORI ANN DEVLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3343 |
| | ) | |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Lori Ann Devlin appeals from the denial of her application for Social Security Disability Insurance under Title II of the Social Security Act and her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Devlin filed a Motion for Summary Judgment (d/e 15).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 18).  Devlin then filed a document titled: The Commissioner's Memorandum Does Not Address the Issues Presented in

---

[1] The Court takes judicial notice that Dr. Kilolo Kijakazi, Ph.D., is now the Acting Commissioner of Social Security.  As such, he is automatically substituted in as the Defendant in this case.  Fed. R. Civ. P. 25(d). The Court refers to Acting Commissioner Kijakazi as "Commissioner."

Petitioner's Brief, but Rather Attempts to Misdirect the Argument, Cherry-Picks the Exhibits, and Makes Citations to the Record That Were Not Made by the Administrative Law Judge in the First Place (d/e 19).  The parties consented to proceed before this Court.  Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered January 1,  2021 (d/e 8).  For the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

## BACKGROUND

Devlin was born on November 10, 1974.  She secured a GED and had no past relevant work.  She applied for Disability Benefits on April 17, 2019.  She alleged that she became disabled on November 30, 2014.  Devlin suffered from osteoarthrosis, obesity, fibromyalgia; mixed connective tissue disease, lupus, rheumatoid arthritis (collectively autoimmune disease); and asthma/chronic obstructive pulmonary disorder (COPD).  Certified Transcript of Proceedings Before the Social Security Administration (d/e 11 and 12) (R.), at 15, 18, 24, 38. [education].

## STATEMENT OF FACTS

### Evidence Presented Before the Evidentiary Hearing

On October 7, 2014, Devlin saw rheumatologist Dr. Robert Trapp, M.D.  Devlin reported joint pain in her hands, elbows, shoulders, and feet.

Her sed rate was 37 and she reported a history of low vitamin D, B12, and iron.  Dr. Trapp ordered blood tests, including an antinuclear antibodies (ANA) test.  R. 391.

On January 13, 2015, Devlin saw Dr. Trapp.  She reported joint pain and fatigue and said she felt better when she took a tapering dose of prednisone.  Two days after finishing the course of prednisone, she reported increased pain and fatigue and pain in her hands.  Her level of pain on prednisone was 4/10 and without prednisone, her worst pain was 10/10.  On examination, Devlin had no sign of active synovitis (inflammation of connective tissue that lines the inner surface of joint capsules and tendon sheath).  R. 22.  Dr. Trapp assessed a possible autoimmune disorder with arthralgias and fatigue and positive ANA and positive ribonucleoprotein (RNP) test.  R. 382-83, 490-91.

On June 29, 2015, Devlin saw Dr. Trapp.  She reported feeling "crappy" and had pain in her hands, elbows, shoulders, and knees.  She also had pain in her lower back that affected her sleep.  She was not aware of any swelling and she reported fatigue.  She went to sleep between 7 and 9 p.m. and woke up at 9 a.m.  On examination, Devlin was alert and oriented but appeared fatigued and seemed to lack energy.  Devlin's musculoskeletal examination was unremarkable except she was tender

diffusely and had soft tissue pain.  Dr. Trapp prescribed methotrexate and doxepin.  R. 355-56,467-68.

On July 29, 2015, Devlin saw Dr. Trapp.  Devlin had no complaints. After starting methotrexate and doxepin, she noticed less fatigue but no change in joint discomfort.  She reported continuing pain in her hands, wrists, and feet and had no adverse effects from the medication.  Devlin's musculoskeletal examination was unremarkable except she had tenderness in several joints without peripheral joint swelling.  Dr. Trapp assessed connective tissue disease with positive ANA and Positive RNP tests; improved fatigue but continued joint discomfort without objective findings of synovitis.  R. 352.

On September 1, 2015, Devlin saw rheumatologist Dr. Trapp.  She reported pain, and some stiffness in her hands, elbows, shoulders, and ankles.  R. 349.  On examination, Devlin's musculoskeletal exam was unremarkable; her peripheral joints had no swelling or significant tenderness on passive range of motion or direct palpation.  R. 349-50.

On September 4, 2015, Devlin completed a Multi-Dimensional Health Assessment Questionnaire for Dr. Trapp.  She had no difficulty dressing herself, getting out of bed, walking outdoors on flat ground, bathing, picking up clothing, getting in and out of a car, or getting a good night's sleep.  She

had great difficulty participating in recreational activities and walking two miles and she rated her pain over the prior week at 6/10.  She had moderate pain in her fingers, wrists, and shoulders; mild pain in her elbows, and ankles; no pain in her hips, knees, and toes; and moderate pain in her back.  R. 375.  She reported fatigue.  R. 376.

On November 3, 2015, Devlin saw Dr. Robert Trapp and reported that she was tired all the time.  Devlin's musculoskeletal examination was unremarkable and she had no peripheral joint tenderness or swelling.  R. 345. Devlin also completed a Multi-Dimensional Health Assessment Questionnaire.  R. 372-73.  She reported some difficulty dressing herself, getting out of bed, and picking up clothes and she could walk three miles with some difficulty.  She also had some difficulty getting a good night's sleep.  She reported moderate pain in her fingers and shoulders, and mild pain in her wrists and elbows.  She had no pain in her hips and knees and had mild pain in her ankles and toes.  She was stiff when she got up in the morning for more than 90 minutes and she was fatigued.  R. 371-73.

On December 15, 2015, Devlin saw Dr. Trapp.  Her musculoskeletal examination was unremarkable and she had no peripheral joint swelling or significant pain with movement of the joints.  R. 343-44.

On January 26, 2016, Devlin saw Dr. Trapp.  She was more tired, but her pain was not bad and she was taking prednisone daily.  R. 336.  Devlin had been taking methotrexate since June 29, 2015.  She had improved arthritis symptoms with less pain and improved function, but reported morning stiffness and pain in her hands and knees and fatigue.  She believed her symptoms improved since she started taking methotrexate.  R. 337.  Devlin's musculoskeletal examination was unremarkable except for crepitation in her knees but no effusion or increase in warmth.  She had no signs of peripheral joint swelling.  R. 338.

On March 16, 2016, Devlin saw Dr. Trapp.  She reported fatigue and pain in her hands, elbows, hips, knees, and feet.  R. 333.  On examination, Devlin was alert and appeared to be in mild distress; her musculoskeletal examination was unremarkable except for tenderness on palpation in the small joints of the hands, mild tenderness in her shoulders and elbows, crepitation in the knees but no evidence of effusion or increased warmth, and pain with movement in the ankles and feet.  Devlin had full range of motion in her hands and good fist formation and  Dr. Trapp saw no evidence of synovitis.  R. 334.

On April 13, 2016, Devlin saw Dr. Trapp.  She was not feeling well and had a fever of 100 degrees and pain in her hands, feet, knees, and

wrist.  Devlin had been assessed with systemic lupus erythematosus

(SLE).  Dr. Trapp noted that Devlin had a positive ANA and positive RNP

tests in the past.  R. 330-31, 428-29.  Her recent ANA test was negative.

On examination, Devlin was 5 feet 6 inches tall, weighed 226 pounds, and

had a body mass index (BMI) of 36.48; she was in no acute distress; her

musculoskeletal examination was unremarkable except for tenderness in

many joints to palpation; she had normal range of motion and no other

significant abnormalities.  Dr. Trapp noted diagnosis in the past of SLE and

a low-grade fever with fatigue and arthralgias and adjusted her medication

and repeated a sedimentation rate test and vitamin D level test.  R. 331-32,

429-30.

On May 16, 2016, Devlin saw Dr. Trapp.  She was still tired and had

more pain recently in her hands, elbows, hips, knees, and feet.  R. 431.

Devlin's musculoskeletal examination was unremarkable except for

tenderness with palpation of the small joints in the hands but full range of

motion and good fist formation; her shoulders and wrists were mildly

tender; her knees had crepitation but no evidence of effusion or increased

warmth; and her feet had pain on movement.  Devlin had no peripheral joint

synovitis.  Dr. Trapp assessed no evidence of active synovitis to explain

her pain and took Devlin off methotrexate due to side effects.  He continued her other prescriptions.  R. 432.

On August 11, 2016, Devlin saw rheumatologist Dr. Sriya Ranatunga, M.D., to establish care.  Devlin had been diagnosed with mixed connective tissue disease and Raynaud's about a year and a half earlier.[2]  She was taking prednisone and did not think the pain was worse on a prednisone taper.  She reported poor sleep and tiredness during the day and had diffuse body aches and pains.  R. 700.  On examination, Devlin had tenderness over the MCP and PIP joints without synovitis and had tender points in the upper and lower torso.  R. 702. Dr. Ranatunga recommended pain medication, low impact exercises, and increased activity to address fibromyalgia.  Dr. Ranatunga ordered laboratory tests to reevaluate Devlin's mixed connective tissue disease/lupus, Raynaud's.  R. 703.

On November 7, 2016, Devlin saw Dr. Ranatunga.  She had joint pain in her hands, wrists, elbows, knees, and hips.  The pain had not improved and she reported chronic fatigue, diffuse body aches, and insomnia.  She had no Raynaud's phenomenon since her original diagnosis.  R. 696.  On examination, Devlin had a cautious gait but no ataxia or wide base.  She

---

[2] Raynaud's phenomenon is intermittent ischemia of the fingers and toes with parathesias and pain. Dorland's Illustrated Medical Dictionary (32nd ed. 2013) (Dorland's), at 1430).

had mild tenderness to palpation of the metacarpophalangeal/proximal interphalangeal/distal interphalangeal (MCP/PIP/DIP) joints and wrists, but no erythema or swelling.  She also had tenderness to palpation in the elbows, hips, and knees, but no erythema or effusions.  She had limited range of motion in both shoulders and normal range of motion in all other joints in her extremities.  She had 5/5 strength in her extremities and her sensation was intact in her extremities.  R. 698.  Dr. Ranatunga said the meloxicam should help with the pain and recommended low impact exercises and weight reduction for fibromyalgia and osteoarthritis.  R. 699.

On December 2, 2016, Devlin saw Dr. Ranatunga.  She reported feeling much better after she started taking the NSAID meloxicam for her hand pain.  She had less stiffness and fatigue and no chest pain or shortness of breath.  R. 691.  On examination, Devlin had a cautious gait but no ataxia or wide base; she had no tender points and no synovitis in her joints; she had 5/5 strength in her extremities; her sensation was intact; her ANA screen test was positive; her sediment rate was abnormal, and her C-reactive protein (CRP) test was abnormal.  Dr. Ranatunga assessed mixed connective tissue disease and noted that Devlin's symptoms had improved on meloxicam.  She increased the dosage of meloxicam.  R. 695.

On January 27, 2017, Devlin saw Dr. Akshra Verma, M.D., for a follow up on a pulmonary function test that showed Devlin had COPD. Devlin reported that she had asthma but did not need much treatment for it. She had coughing and dyspnea for about a month and reported fatigue and pain all over her body including joints and muscles.  Dr. Verma noted that Devlin was being seen by rheumatologists Drs. Trapp and Ranatunga and had been on prednisone for about a year and a half.  R. 799.  On examination, Devlin weighed 220 pounds and had a BMI of 34.98; she had tenosynovitis in both hands especially the right; she had no clubbing or cyanosis; her wrists were tender; her range of motion was within normal limits, and her joints were stable; she had no sensory loss.  R. 802.  Dr. Verma administered albuterol and prescribed an inhaler for Devlin's COPD. R. 803.

On August 2, 2017, Devlin again saw Dr. Ranatunga.  She reported diffuse body aches and pain, as well as joint pain in the small joints of her hands.  R. 682.  On examination, Devlin had a cautious gait but no ataxia or wide base; she had no tender points and no synovitis in her joints; she had 5/5 strength in all her extremities and sensation was intact in her extremities.  Dr. Ranatunga found no evidence of active mixed connective tissue disease other than arthalgias and prescribed the NSAID meloxicam

and ordered lab work.  R. 685.  Dr. Ranatunga prescribed low impact

stretching exercises and Flexeril at bedtime for Devlin's fibromyalgia.  R.

686.

On October 11, 2017, Devlin saw Dr. Ranatunga.  Two to three

weeks earlier, Devlin noticed increased pain throughout her body.  She had

pain, swelling, and stiffness in the small joints of the hand.  Her Raynaud's

was stable.  R. 677.  On examination, Devlin had no tender points in the

upper and lower torso; she had no synovitis in her joints; she had a

cautious gait, but no ataxia or wide base.  R. 680.  Dr. Ranatunga

prescribed a prednisone taper and ordered lab work.   Dr. Ranatunga

stated that Devlin's symptoms from her mixed connective tissue disease

had improved with daily use of the NSAID meloxicam and recommended

low impact exercise and weight reduction for Devlin's fibromyalgia.  R. 681.

On October 30, 2017, Devlin saw Dr. Ranatunga.  Her ANA and RNP

tests from October 11, 2017, were positive.  R. 672.  On examination,

Devlin had no tender points in her upper or lower torso; she had no

synovitis; she had 5/5 strength in all her extremities; her sensation was

intact.  Dr. Ranatunga continued Devlin's medications and recommended

low impact exercises and weight reduction for her fibromyalgia.  R. 675.

On February 2, 2018, Devlin saw Dr. Ranatunga.  She reported diffuse joint pain and pain in her long bones, as well as pain in her feet, knees, hips, hands, and shoulders.  She had no morning stiffness or shortness of breath.  She had reproducible chest pain and Raynaud's phenomenon.  R. 667.  On examination, Devlin had tenderness in both wrists and several metatarsophalangeal (MTP) joints.  She had 5/5 strength in all extremities.  Dr. Ranatunga added tramadol to Devlin's medications and ran lab tests.  A prednisone taper would be prescribed depending on the blood test results.  R. 670-71.

On May 2, 2018, Devlin saw Dr. Ranatunga.  She reported upper back pain and went to the emergency room and was diagnosed with a urinary tract infection.  She reported no chest pain or shortness of breath and had pain in the small joints of the hand and stiffness with no swelling.  R. 661.  Devlin was noted as ANA positive.  R. 662.  On examination, Devlin had tenderness in both wrists and hips, and several MTP joints.  She had 5/5 strength in all her extremities.  Dr. Ranatunga prescribed meloxicam and stretching and strengthening exercises and planned to review the lab results from the emergency room visit.  R. 664-65.

On May 22, 2018, Devlin saw Dr. Ranatunga.  She reported increased pain in her joints, especially the small joints of the hands with

swelling and stiffness.  Her current medication was not helping with the

pain.  R. 656.  On examination, Devlin had few tender points in the upper

and lower torso; she had tenderness in the MCP and PIP joints of both

hands; she had painful range of motion in both wrists; she had normal

strength in all her extremities.  Dr. Ranatunga prescribed a prednisone

taper.  R. 659.

On June 25, 2018, Devlin saw Dr. Ranatunga.  She reported that a

prednisone taper prescription from her last appointment "helped a lot" with

joint pain in her hands, feet, and knees.  R. 652.  On examination, Devlin

had a few tender points in the upper and lower torso and no synovitis was

noted.  She had 5/5 strength in her extremities.  Dr. Ranatunga assessed

mixed connective tissue disease manifested by inflammatory arthropathy

and Raynaud's phenomena.  Devlin responded to prednisone.  Dr.

Ranatunga prescribed an NSAID diclofenac to help with joint pain "as she

had very minimal disease."  R. 655.

On September 26, 2018, Devlin saw Dr. Ranatunga.  She reported

that she was doing well overall and her joint pain was stable on current

medication.  R. 646.  On examination. Devlin had tender points in the upper

and lower torso and no synovitis in her joints.  Dr. Ranatunga continued

Devlin's meds for mixed connective tissue disease and recommended stretching and strengthening exercises for Devlin's fibromyalgia.  R. 648.

On February 2, 2019, Devlin saw Dr. Ranatunga.  She reported more fatigue.  She had no significant joint swelling.  R. 642.  On examination, Devlin was in no acute distress; she had no synovitis in her joints; she had tender points in her upper and lower torso.  Dr. Ranatunga stated that Devlin was doing well with her SLE with no current or interval flaring of joint pain, swelling, redness, warmth, or limited range of motions and checked her vitamin D and thyroid stimulating hormone (TSH) levels due to her reports of fatigue.  R. 644-45.

On May 13, 2019, Devlin saw Dr. Ranatunga.  She reported pain in both hands and Raynaud's and continuing fatigue.  She had a dizzy spell in the last month, muscle and joint pain, and reported intermittent numbness and tingling in her hands.  R. 638.  On examination, Devlin was 5 feet 6 inches tall, weighed 223 pounds, and had a BMI of 36.01; she appeared to be in a good state of health; she had no synovitis in her joints; she had tender points in her upper and lower torso.  Dr. Ranatunga assessed mixed connective tissue disease but no clinical evidence of active disease and ordered blood and urine tests.  R. 640.

On May 17, 2019, Devlin saw advanced practice nurse (APN) Jennifer Rimar, APRN.  She complained of sporadic dizziness for the past two months and had intermittent numbness in her hands bilaterally.  On examination, Tinel's sign and Phalen's sign were both negative.[3]  Devlin had normal gait and station.  Rimar prescribed meclizine for the dizziness.  R. 709-10, 988-89.

On June 2, 2019, Devlin prepared a Function Report—Adult form.  R. 232-39.  Devlin stated that most days she suffered from "severe exhaustion" and pain primarily in her hands, feet, arms, and shoulders.  She had to "pick and choose" her activities because she had so little energy and she reported pain in her shoulders, hips, and legs if she sat or stood for too long.  She was more comfortable lying down and on a typical day, she got up about 11:00 a.m.  She either started a load of laundry, spent five to 10 minutes picking up the house, or ran an errand such as buying groceries.  She did household chores about three times a week and she went shopping once or twice a week.  After cleaning or shopping, she came home and lay down until supper.  She made something quick for supper, ate, and went back to bed.  She took care of her two children aged 15 and 14 years old.  She cooked simple meals three nights a week and

---

[3] Tinel's sign and Phalen's sign are tests for carpal tunnel syndrome. See Dorland's, at 1714, 1716.

her children and her boyfriend helped her take care of her pets.  Devlin
sometimes had difficulty sleeping due to pain and sometimes slept for over
12 hours at a time.  She had no problem performing her personal care.
She drove and could go out alone and could pay bills, count change, and
handle bank accounts.  R.232-35.

Devlin opined that her impairments affected her ability to squat, bend,
stand, sit, remember, and use her hands.  She said she forgot things.  She
could walk a block without stopping but then needed to rest five to 10
minutes.  She sometimes finished what she started, she could follow
instructions, get along with authority figures, and handle changes in
routines.  She did not handle stress well.  R. 236-38.

On June 3, 2019, Devlin completed a Physical Impairment
Questionnaire.  R. 241-42.  Devlin said she had difficulty using kitchen
utensils because of pain and fatigue in her hands, arms, and shoulders.
She had trouble opening jars when she experienced pain and weakness in
her hands and she could carry "a couple small bags of groceries."  She
could sit for an hour before she started hurting.  She needed to rest during
the day because if she did too much during the day, she fell asleep around
supper time and slept until noon the next day.  R. 241-42.

On June 7, 2019, Devlin saw APN Rimar.  Her dizziness was better, but she reported palpitations a few times per day with "shock like" chest pain.  She did not have either chest pain or palpitations at the office visit. R. 983-84.  On examination, she was oriented and in no acute distress and she had normal gait and station.  R. 983-84.  Rimar referred Devlin to a cardiologist.  R. 983.

On July 26, 2019, state agency physician Dr. Bharati Jhaveri, M.D., opined that Devlin's physical impairments were non-severe.  R. 78-79.

On August 19, 2019, Devlin saw Dr. Ranatunga.  She had increased pain in almost all her joints which interfered with her sleep.  She was always tired and fatigued.  R. 968.  On examination, Devlin appeared to be in a good state of health; she had tender points in the upper and lower torso.  Dr. Ranatunga assessed that Devlin's mixed connective tissue disease seemed to be stable and that her fibromyalgia was active with increased pain, fatigue, and sleep disturbance.  Dr. Ranatunga added tramadol at bedtime to Devlin's Flexeril and diclofenac prescriptions.  R. 970.

On August 22, 2019, Devlin saw resident Dr. Nitin Tandan, M.D., working with Dr. Andrew Varney, M.D.  She complained of dizziness similar

to lightheadedness. On examination, she was in no acute distress and ambulated without difficulty.  R. 962-63.

On September 3, 2019, Devlin saw Dr. Zafar Quader, M.D., for a lesion on her liver.  R. 957.  On examination, she was in no acute distress and her range of motion was within normal limits.  R. 959.  Dr. Quader ordered a CT scan of her liver.  R. 960.

On September 6, 2019, Devlin saw cardiologist Dr. Abdul Hafiz, M.D., for evaluation of symptoms of dizziness and palpitations.  R. 953.  On examination, Devlin had normal gait and station.  An EKG showed normal sinus rhythm and Dr. Hafiz ordered a stress test.  R. 955-56.

On September 23, 2019, Devlin again saw Dr. Ranatunga.  She reported continuing fatigue but her joint pain was stable.  R. 1073.  On examination, Devlin had no synovitis in her joints and Dr. Ranatunga assessed mixed connective disease that was stable without any evidence of active disease.  Dr. Ranatunga recommended stretching and strengthening exercises for Devlin's fibromyalgia.  R. 1075.

On November 27, 2019, Devlin saw resident Dr. Christine Warner, M.D. working with Dr. Verma.  She reported pain related to her fibromyalgia, osteoarthritis, and rheumatoid arthritis.  She had fatigue, mild snoring, and persistent daytime sleepiness and spent most of her time in

bed.  She usually did not leave the house or do any exercise due to fibromyalgia.  She said that the tramadol at night helped with the pain, but the diclofenac did not help.  She had point tenderness on her right flank and the pain was similar to the pain she had before when she had a kidney infection.  R. 1063.  On examination, she was in no acute distress; her breathing was normal; her neurologic exam was normal; she had point tenderness on her right flank.  R. 1064.  Dr. Warner prescribed baclofen for daytime fibromyalgia pain and scheduled physical therapy.  Dr. Warner told her to get out of bed and go to physical therapy and ordered a lab test to check for possible infection indicated by right flank pain.  R. 1062.

On November 29, 2019, state agency physician Dr. Lisa Green-Hill, D.O., prepared a Physical Residual Functional Capacity Assessment.  R. 97-99.  Dr. Green-Hill opined that Devlin could lift 25 pounds occasionally and 20 pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally crawl; and frequently crouch, kneel, handle objects, finger objects, climb stairs, ramps, ladders, ropes, and scaffolds.  Dr. Green-Hill opined that Devlin had no other functional limitations due to her physical impairments. R. 97-99.

On March 6, 2020, Devlin saw resident Dr. Tharani Sundararajan, M.D., working with Dr. Verma.  Devlin took a home sleep study that showed

sleep apnea.  She was tired throughout the day.  On examination, her breathing was normal to auscultation; she had normal gait and station; her joints, muscles, and bones were normal to inspection and palpation; she had a good hand grip bilaterally; she could push against resistance with both legs.  R. 1035.  Dr. Sundararajan made a referral to pulmonology for sleep apnea.  R. 1035.

On June 15, 2020, Devlin saw pulmonologist Dr. Haitham Bakir, M.D., as a new patient for sleep apnea.  Devlin reported that she always felt tired and she was snoring and gasping for air at night.  A home sleep study showed that she had sleep apnea.  Her asthma was doing well on her current medications.  R. 1029.  On examination, Devlin was in no acute distress; her breathing was normal with no use of accessory muscles and no crackles, wheezes, rales, or rhonchi; she had a normal gait and station. Dr. Bakir said Devlin could undergo exercise testing and/or participate in an exercise program.  R. 1032.  Dr. Bakir ordered a full night sleep study to evaluate her for appropriate treatment of her sleep apnea and recommended weight loss.  R. 1032-33.

<u>The Evidentiary Hearing</u>

On August 25, 2020, an Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 31-61.  Devlin appeared with her counsel.  Vocational expert Ronald Malik also appeared.  R. 33.

Devlin testified she secured a GED.  She last worked in November 2014 and had worked temporary office jobs for a temporary service agency.  R. 38.  Devlin had a driver's license and drove a car to shop and to go to doctor's appointments.  R. 44.

Devlin said her pain medication helped alleviate some of her pain, so she was "not in excruciating pain all the time."  She had no side effects from her medications.  R. 39.

Devlin said she was so exhausted and fatigued that she could not "function or do anything."  R. 48.  She spent most of her day in bed watching television.  She was "either in too much pain or I'm too exhausted to do anything."  She sometimes slept for over 24 hours at a time.  During these days of sleep, she only got up to go to the bathroom and she missed doctors' appointments because she was too exhausted.  R, 47.  She had some days that were better, when she had "a little bit of energy," but she had more bad days than good.  On bad days, she had no energy at all.  R. 48.

Devlin had a sleep study in July 2020 and said they were setting her up with a continuous positive air pressure (CPAP) machine to use while sleeping, but she did not have the CPAP machine yet.  R. 49.

Devlin testified that she had pain and swelling in her hands four out of seven days.  On those days, her hands were swollen all day long.  She had such regular swelling in her hands since 2018.  R.  49-50.  She had difficulty using her hands due to the swelling and pain.  She had difficulty opening jars and could not use a manual can opener.  She also dropped small objects regularly and had difficulty bathing.  She bathed two to three times a week because bathing was too painful.  She dressed herself, but she did not wear socks because they hurt.  She left her shoes tied and slipped them on and off.  She did not wear any clothes with buttons because she could not button buttons, but she could operate a zipper.  She said she could not tie shoes.  R. 45-47.

Devlin also had pain in her elbows, shoulders, hips, knees, and feet.  Her knees swelled twice a week and were swollen all day long on these days.  Her elbows, hips, and shoulders did not swell, but they hurt.  R. 52.

Devlin agreed that she had pain "pretty well all over" and described her level of pain: "I'm constantly in pain but I have days where I can function a little bit better, but then the days that are really bad I'm sleeping

and not doing anything." R. 52. Her pain was usually at about 7/10. She rated her pain on her better days at 5/10 and on her worst days at 9/10. About half of the days in a month, her pain was at 7/10; about five days a month her pain was at 5/10; and 10 days a month her pain was at 9/10. R. 52-53.

Vocational expert Malik then testified. Malik testified that Devlin did not have any past relevant work. R. 54. The ALJ initially asked Malik the following hypothetical question:

> All right, well, Mr. Malik I'd like you to assume we have an individual the same age, education and experience as the claimant. This individual is limited to medium work, limited to frequent climbing of ramps, stairs and ladders, limited to occasional climbing of ropes and scaffolds. They're limited to frequent kneeling and crouching, limited to occasional crawling, limited to frequent handling and fingering bilaterally. Are there jobs in the economy such an individual can perform?

R. 54. The ALJ then asked Malik whether a person who was limited to light work and had all the other limitations described in the quoted hypothetical question could performs jobs that existed in the national economy. R. 55. Malik opined that such a person could perform jobs such as a fastener with 24,000 such jobs in the national economy, a routing clerk with 90,000 such jobs in the national economy, and marker with 125,000 such jobs in the national economy. The three examples were representative of the types of jobs that such a person could perform. R. 55-56.

The ALJ asked Malik to consider a person who was further limited to "occasional climbing of ramps, stairs and ladders, limited to no climbing of ropes and scaffolds, limited to occasional stooping, kneeling, crouching and crawling and still limited to frequent handling and fingering bilaterally." Malik opined that such a person could perform the three representative jobs listed.  R. 56.

The ALJ asked Malik to change the exertional limitation to sedentary work rather than light work.  Malik opined that such a person could perform the sedentary jobs of document preparer with 18,000 such jobs in the national economy, addresser with 1,000 such jobs in the national economy, and table worker with 4,000 such jobs in the national economy.  Malik testified that these three jobs were representative of the types of jobs such a person could perform.  R. 56.

Malik further opined that a person could not work if she missed work on an unscheduled basis more than eight to 10 days per year.  Malik said that a person could not work if she was less than 80 percent productive at work.  R. 56-57.  Malik opined that a person could not work if she took two additional unscheduled breaks of 15 to 30 minutes.  R. 59.  The hearing concluded.

## THE DECISION OF THE ALJ

The ALJ issued his decision on September 23, 2020.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Devlin met her burden at Steps 1 and 2.  She had not worked since her Onset Date, and she suffered from the severe impairments of osteoarthrosis, obesity, and fibromyalgia.  R. 18.  The ALJ found that Devlin's impairments of mixed connective tissue disease, rheumatoid arthritis, and asthma/COPD were not severe. The ALJ found that "these impairments were treated largely conservatively, and without significant exacerbation or complication."  The ALJ, however, considered these impairments in determining Devlin's RFC.  R. 18.

At Step 3, the ALJ determined that Devlin's impairments or combination of impairments did not meet or equal a Listing.  The ALJ specifically considered Listing 14.06 for undifferentiated and mixed connective tissue disease.  The ALJ also separately evaluated whether

Devlin's fibromyalgia equaled a Listing pursuant to the instructions in SSR

12-2.  R. 20.

> The ALJ then found that Devlin had the following RFC:
>
> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform light work as defined in 20 CFR 404.1567(b) and
> 416.967(b) except occasionally climb ramps, stairs and ladders;
> never climb ropes or scaffolds; occasionally stoop, kneel,
> crouch and crawl. The claimant is further limited to frequent
> handling and fingering bilaterally.

R. 21.  The ALJ relied on medical findings that Devlin's symptoms from her

mixed connective tissue disease did not include synovitis of the joints,

almost never included fevers, and never included weight loss; and the

symptoms responded to prednisone tapers.  The ALJ also relied on the

consistent findings that Devlin had 5/5 strength in her extremities.  The ALJ

also cited several examinations in 2019 in which she had normal gait and

station and normal range of motion.  The ALJ also noted the March 6,

2020, examination in which Devlin's joints, bones, and muscles were

normal to inspection and palpation; she had good bilateral hand grip; and

she was able to push against resistance with both legs.  R. 22.  The ALJ

also stated that the records showed only conservative treatment measures

were used, and Devlin testified that the medications provided some relief.

The ALJ also found the opinions of Dr. Green-Hill to be persuasive,

although the ALJ limited Devlin to light work while Dr. Green-Hill opined

Devlin could lift and carry more weight than set forth in the definition of light

work.  R. 23.  The ALJ rejected Dr. Jhaveri's opinion that Devlin's physical

impairments were non-severe.  R. 23.

At Step 4, the ALJ concluded that Devlin did not have past relevant

work.  The ALJ moved on to Step 5.   R. 24.

At Step 5, the ALJ found that Devlin could perform a significant

number of jobs that existed in the national economy.  The ALJ considered

the Medical-Vocational Guidelines, 20 C.F.R., Part 4040, Subpart P,

Appendix 2, and the opinions of vocational expert Malik that a person with

Devlin's age, education, work experience, and RFC could perform the

representative jobs of fastener, marker, and routing clerk.  The ALJ further

found that if Devlin's RFC was modified to be limited to sedentary work,

she could perform the representative jobs of document preparer,

addresser, and table worker.  The ALJ concluded that Devlin was not

disabled.  R. 24-25.

Devlin administratively appealed the decision of the ALJ.  On

November 20, 2020, the Appeals Council denied Devlin's request for

review.  The decision of the ALJ then became the final decision of the

Defendant Commissioner.  R. 1.  Devlin then brought this action for judicial
review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine
whether it is supported by substantial evidence.  Substantial evidence is
"such relevant evidence as a reasonable mind might accept as adequate"
to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).
This Court must accept the findings if they are supported by substantial
evidence and may not substitute its judgment or reweigh the evidence.
Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782
F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation
of statements regarding the intensity, persistence, and limiting effect of
symptoms unless the evaluation is patently wrong and lacks any
explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,
367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);
SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social
Security Administration no longer uses the term credibility in the evaluation
of statements regarding symptoms).  The ALJ must articulate at least
minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d
329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The decision of the ALJ was supported by substantial evidence.  The medical evidence cited by the ALJ supported the conclusion that Devlin's mixed connective tissue disease was effectively treated with steroids and pain medication.  The evidence cited also supported the ALJ's RFC finding.  The RFC finding was also supported by the opinion of Dr. Green-Hill.  No medical professional offered opinions that contradicted Dr. Green-Hill.  See Gedatus v. Saul, 994 F.3d 893, 904 (7th Cir. 2021) ("A fundamental problem is she offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set."); Rice v. Barnhart, 384 F.3d 363, 370-71 (7th Cir. 2004); see also Best v. Berryhill, 730 F.App'x 380, 382 (7th Cir. 2018) ("There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'") (quoting Rice, 384 F.3d at 370).

The RFC finding and the opinions of vocational expert Malik supported the determination at Step 5 that Devlin could perform a significant number of jobs that existed in the national economy.  The decision was supported by substantial evidence.

Devlin argues that the ALJ erred at Step 2 by finding that Devlin's mixed connective tissue disease, rheumatoid arthritis, and lupus were severe impairments. The Court disagrees. An ALJ does not commit reversible error at Step 2 by finding impairments to be non-severe as long as the ALJ considers those impairments in the other steps of the Analysis. See Castile v. Astrue, 617 F.3d 923, 926-27 (7th Cir. 2010). Here, the ALJ considered these conditions in the rest of the Analysis. The ALJ addressed specifically whether Devlin met Listing 14.06 for mixed connective tissue disease. The ALJ considered the evidence of Devlin's mixed connective tissue disease, rheumatoid arthritis, and lupus in his formulation of the RFC. The ALJ considered that RFC in the remainder of the Analysis. The finding at Step 2 that these conditions were non-severe was not reversible error.

Devlin argues the ALJ erred by cherry picking evidence while ignoring material contrary evidence in formulating the RFC. The Court again disagrees. The ALJ is not required to mention every piece of evidence. He must address the material evidence and cannot ignore contrary material evidence. See Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009). Devlin cites numerous additional medical records not cited by the ALJ. Devlin fails to show how the additional evidence was contrary to ALJ's findings. In fact,

some of the additional evidence would have strengthened the support for the ALJ's findings.  Dr. Ranatunga stated on June 25, 2018, that Devlin had "very little" autoimmune disease, and she stated on May 13, 2019, and September 23, 2019, that she did not show clinical evidence of active autoimmune disease.  Drs. Trapp and Ranatunga consistently and repeatedly stated that Devlin had no synovitis.  The records cited by Devlin shows that Devlin responded to prednisone and NSAIDs such as meloxicam and diclofenac.  This evidence is consistent with the ALJ's findings.  The ALJ did not err by failing to cite every single example to support his position.

Devlin argues that the ALJ erred by giving weight to only one doctor's opinions. The ALJ did not rely solely on Dr. Green-Hill's opinion.  The ALJ reviewed the record and cited relevant evidence from the record.  Dr. Green-Hill's opinion furthermore was relevant and appropriate to consider. Furthermore, Devlin failed to present any opinion evidence; she cannot complain that the ALJ relied on the evidence presented.  There was no error.

Devlin argues that the ALJ erroneously discounted her statements about the functionally limiting effects of her symptoms.  The Court again disagrees.  The ALJ discounted her statements because the medical

records showed that she responded to prednisone tapers and other medication to control her symptoms; the examination notes showed no signs of synovitis; the examination notes showed she retained full strength throughout; and the examination notes showed she retained the ability to ambulate without an assistive device, although sometimes with some difficulty.  These examination notes provide substantial evidence to support the ALJ's conclusion that the medical evidence was inconsistent with Devlin's description that she essentially never got out of bed and could not do anything.  The Court will not overturn the ALJ's finding in light of the substantial evidence that supports it.  See Pepper, 712 F.3d at 367; Elder, 529 F.3d at 413-14.

Devlin argues that the ALJ erred by not including in the hypothetical question posed to Mikel all of Devlin's limitations.  The Court again finds no error.  The ALJ included in the questions to vocational expert Mikel all of the limitations in the RFC determination.  The RFC determination was supported by substantial evidence for the reasons stated above, so the ALJ did not err by limiting his questions to those limitations.  See Schmidt v. Astrue, 496 F.3d 833, 846 (7th Cir. 2007) ("[T]he ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible.").

Devlin last argues that the ALJ erred in limiting Devlin to frequent handling and fingering bilaterally instead of occasional.  The term frequent means one-third to two-thirds of the time at work.  The term occasional means up to one-third of the time at work.  As explained above, the medical evidence supported the RFC finding.  The medical evidence supported the conclusion that Devlin's autoimmune disease did not show signs of synovitis and that prednisone and her other medication were effective. This evidence and the opinions of Dr. Green-Hill supported the finding that Devlin could frequently handle and finger objects.  There was no error.[4]

THEREFORE, IT IS ORDERED that Defendant Commissioner's Motion for Summary Affirmance (d/e 18) is ALLOWED, Plaintiff Lori Ann Devlin's Motion for Summary Judgment (d/e 15) is DENIED, and the decision of the Defendant Commissioner is AFFIRMED.

---

[4] In addition, Devlin mentions summarily and without any analysis or development,
> In issues presented, issue is taken with the findings of the Administrative Law Judge as to whether the claimant's intellectual functioning issues are a severe impairment as step two of the decision-making process, whether the claimant met or equaled a Listing of Impairment at step three, whether the Administrative Law Judge considered the Listing of Impairment for 12.05 and adequately evaluated Listing of Impairments 12.04 and 12.06, and whether other work existed in step four of the sequential evaluation because the Administrative Law Judge did not properly evaluate the impairments and symptoms documents in the medical evidence.

Brief in Support of Plaintiff's Motion for Summary Judgment (d/e 16), at 9.  These undeveloped arguments are forfeited. See United States v. Stadfeld, 689 F.3d 705, 712 (7th Cir. 2012); United States v. Jones, 278 F.3d 711, 717 (7th Cir. 2002); Kelly v. E.P.A., 203 F.3d 519, 522 (7th Cir. 2000).

THIS CASE IS CLOSED.

ENTER:  March 14, 2022


_____ s/ *Tom Schanzle-Haskins* _____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE